597 So.2d 487 (1992)
Mrs. Betty R. CREEL
v.
WASHINGTON PARISH FAIR ASSOCIATION, Natesco Underwriters, Carrol Jackson, ABC Insurance Company, John Doe, and XYZ Insurance Company.
No. CA 90 2304.
Court of Appeal of Louisiana, First Circuit.
March 6, 1992.
Writ Denied May 15, 1992.
*488 Wilson Krebs, Covington, for plaintiff-appellee.
Craig Robichaux, Bogalusa, for defendant-appellant.
Before COVINGTON, C.J., and LeBLANC and WHIPPLE, JJ.
LeBLANC, Judge.
This appeal arises from a personal injury suit brought by Mrs. Betty R. Creel against the Washington Parish Fair Association (WPFA), its insurer, Alliance Insurance Company (Alliance) and Carrol Jackson[1], producer of the WPFA rodeo held during October of 1983. Mrs. Creel attended the WPFA rodeo on October 22, 1983, and was injured when a rodeo competitor was thrown from the horse he was riding during a saddle bronco riding event. The competitor was thrown out of the rodeo arena and on top of Mrs. Creel, who was seated approximately three feet from the arena fence. At trial, the parties stipulated that the rodeo arena was under the control and supervision of the WPFA on the date of the accident. The trial court rendered judgment in favor of plaintiff and against defendants, WPFA, Alliance and Jackson, in solido, in the amount of $97,024.30. WPFA and Alliance appeal this judgment.
On April 4, 1983, the WPFA board of directors, officers and chairmen held a meeting. During this meeting, a motion was passed giving a rodeo committee representative the permission to sign a contract with Mr. Carrol Jackson. This contract was executed later that month and was entitled "Agreement For Rodeo". This agreement set forth the responsibilities of Carrol Jackson, as producer of the rodeo, and the responsibilities of the rodeo committee. The rodeo was to be held on the evenings of October 19, 20, 21, and 22, 1983. The contract provided that the rodeo committee would receive the first $15,000.00 of the ticket proceeds, the producer would receive up to $20,000.00 of the remaining balance, and the balance of the remaining monies would be distributed, with the rodeo committee receiving 30% and the producer receiving 70%. At trial, the testimony established that the 1983 rodeo took place as planned with each party performing the obligations agreed to in the "Agreement for Rodeo".
The evidence establishes that on October 22, 1983, the rodeo arena was enclosed by a pipe and wire fence that measured approximately five feet, six inches to five feet, eight inches tall when measured from the dirt floor of the arena to the top pipe on the fence.[2] The fence measurements varied *489 slightly due to the dirt surface of the arena floor not being precisely level. Immediately outside of the arena fence, on the east and west sides, was a concrete walkway which measured approximately eleven feet, three inches wide, measuring from the fence to the front of a concrete seating platform. On this platform, there were normal bleacher style seats.
On the night that plaintiff attended the rodeo, eighty portable folding chairs had been placed on the cement walkway between the fence and the permanent bleacher seats to increase seating capacity for the event which was typically sold out in previous years. These seats were placed in sets of four on both the east and west sides of the arena with space for walking between the sets of seats. These seats were designated as box seats and tickets for these seats were sold at the price of $8.00 each, compared to the general admission ticket price of $5.00 each for the unreserved bleacher seats.
The evidence established that Mr. Jackson rented the portable chairs and was responsible for their placement in the rodeo arena building. However, Jackson obtained approval of the box seating from WPFA prior to making arrangements for rental of the chairs.
On the night of October 22, 1983, Betty Creel, her husband, Willie R. Creel and their granddaughter attended the rodeo. Mr. Creel purchased box seat tickets because all other tickets had been sold. Mr. and Mrs. Creel and their granddaughter were seated in the first row of portable chairs in one of the box configurations, which was located at approximately the middle of the arena on the west side. Mr. and Mrs. Creel estimated that their seats were set up approximately three feet from the arena fence; Mrs. Creel testified that she could touch the fence with her foot if she stuck her leg out while sitting in the chair. During the course of the rodeo performance, Sharlon Barnes was riding a horse in the saddle bronco event. The horse exited the bucking chute, made several jumps and turned towards the fence in the approximate area where Mrs. Creel was seated. While the horse was near the fence, Barnes was thrown from the horse and over the fence, landing on top of Mrs. Creel. Mrs. Creel was transported to a local hospital for emergency treatment. While at the hospital, Creel reported neck and back pain. X-ray examinations were performed which showed degenerative changes in the thoracic area and cervical fusion[3]. Otherwise, the x-ray examinations were normal. The emergency room physician diagnosed cervical strain and Mrs. Creel was discharged.
Subsequently, Mrs. Creel experienced continuing pain in her neck and back.[4] She was treated conservatively with anti-inflammatory and pain medications by a number of different physicians. During 1985, plaintiff began to report symptoms of pain in her right arm and hand to her family physician, Dr. William P. Crooks. During 1986, testing ordered by a neurosurgeon, Dr. John F. Schuhmacher, revealed ruptured cervical discs at the C3-4 and C6-7 levels. Based on this finding and plaintiff's pain symptoms, Dr. Schuhmacher and another neurosurgeon, Dr. John Jackson, recommended that plaintiff undergo anterior cervical disc surgery to repair the two ruptured discs. However, as of the time of trial, plaintiff had continually refused surgery because Dr. Schuhmacher could not make any guaranties regarding the results of the surgery.
The testing ordered by Dr. Schuhmacher also revealed a mild bulging disc in the lumbar region. Furthermore, electro diagnostic studies, along with plaintiff's symptoms *490 of pain in her right arm and hand established the need for a carpal tunnel decompression surgical procedure which was performed on plaintiff on December 10, 1987.
Trial of this matter was held on May 10, 1990, and was taken under advisement on that date. Reasons for judgment were issued by Judge Watts on August 2, 1990. In these reasons, the judge determined that
... the height of the fence is not faulty so as to render the WPFA liable. Those witnesses with rodeo experience testified that the fence was well within the normal range of height for rodeo arena fences. While normality is not an absolution from fault, the Court is impressed that this cowboy went over this fence at such height and with such velocity that even a somehwat (sic) higher fence may not have prevented the harm to petitioner. Also, the fence must not be so high that rodeo participants cannot quickly get over it to the outside when necessary.
The court concluded that "the harm suffered by Mrs. Creel resulted from the placement of chairs immediately outside the fence." The trial court reasoned as follows:
While some other arrangement of the chairs may have provided adequate protection for spectators sitting in them, the Court considers the frequency with which rodeo performers are thrown from their mounts and finds that the placement of chairs three feet from the fence, such as the one occupied by petitioner, presented an unreasonably dangerous condition. These circumstances giving rise to the defective condition render the WPFA as owners of the premises vicariously or strictly liable and caused the injuries suffered by petitioner. LSA-C.C. article 2317. Further, Jackson is found to be negligent for the actual placement of the chairs in the defective configuration.
The trial court made the following findings regarding plaintiff's claims for damages:
Petitioner seeks damages for injury to cervical and lumbar discs and for carpal tunnel syndrome. The Court is convinced by the medical testimony that petitioner suffered two bulging cervical discs as a result of this accident; however, petitioner has expressed no intention of undergoing surgery, and therefore any compensation for future surgery would be speculative. Further, the Court finds that petitioner's lower back complaints were pre-existing, but may have been somewhat exacerbated by the accident. Symptoms of the carpal tunnel syndrome suffered by petitioner did not appear within three to six months following the accident as would have been expected by Dr. Schumacher [sic]; therefore, the Court finds that condition unrelated to the accident and its related expenses uncompensable [sic]. Based upon the duration and genuineness of petitioner's complaints, an award of $85,000.00 in general damages is deemed appropriate. Petitioner is further awarded special damages in the amount of $12,024.30 consisting primarily of medical bills as outlined with particularity in Appendix A attached to these reasons, ...
Accordingly, the trial court rendered judgment in favor of plaintiff, Betty Creel, and against the defendants, WPFA, Alliance and Carrol Jackson, in solido, in the sum of Ninety-seven Thousand, Twenty-four and 30/100 ($97,024.30) Dollars.[5] WPFA and Alliance appeal the trial court's judgment, raising the following assignments of error:
1. The trial court erred in determining that the placement of movable metal folding chairs constituted a defect under La.C.C. art. 2317.
*491 2. The trial court erred in determining that the defective configuration of the chairs rendered WPFA vicariously or strictly liable.
3. The trial court erred in determining that the "negligence of Jackson somehow rested liability with WPFA".
4. The trial court abused its discretion by awarding clearly excessive damages.
We agree with appellants that the trial court erred in determining that the placement of movable metal folding chairs three feet from the arena fence constituted a defect in the arena pursuant to La.C.C. art. 2317. A distinction must be drawn between a defect in the premises and a dangerous condition on the premises for the purpose of determining whether a strict liability analysis and/or a negligence analysis is appropriate. This court addressed this distinction in Collins v. Christophe, 479 So.2d 537, 542 (La.App. 1st Cir.1985), writ denied, 483 So.2d 1021 (1986):
... [A] foreign object (such as a stone, lump of clay or slice of lemon) on the premises does not constitute a defect in the premises, although it may constitute an unreasonably dangerous condition on the premises.... Thus, negligent and strict liability are applicable when there is a defect in the thing (premises), but only negligent liability is applicable when there is a dangerous condition on the premises.
In Collins, this court concluded that a shag carpet that may have been wet with a slice of lemon on it, but which had no rips or tears in it, was not defective. Thus, a strict liability analysis was not applicable to determine whether the owner of the carpet was liable for injuries sustained by plaintiff, who slipped and fell on the carpet. This court determined that only a negligence analysis was applicable to that fact situation.
In the present case, the record establishes that there was no defect in the arena premises or in the portable chair on which plaintiff sat.[6] Thus, a strict liability analysis is not applicable to the facts of this case.
However, a negligence analysis is proper and we conclude that WPFA was negligent in approving Carrol Jackson's request to set up portable box seats in close proximity to the arena fence. The parties stipulated that WPFA had custody and control of the arena at the time of the rodeo event in question. Although the producer was responsible for many activities in putting on the rodeo, the record establishes that WPFA did not relinquish its control of the rodeo arena pursuant to the "Agreement For Rodeo" and could have prevented Jackson from setting up the box seats in the arena walkway. Rather, WPFA approved Jackson's request to use box seats.[7] In doing so, WPFA failed to exercise care commensurate with the foreseeable danger of a rider being thrown over the arena fence.
The owner, or a person having custody, of immovable property owes his invitee the duty to keep the property in a reasonably safe condition for use which is consistent with the purpose of the invitation, including the discovery of reasonably foreseeable conditions which may be dangerous. Mims v. Bradford, 503 So.2d 1083 (La.App. 2d Cir.), writ denied, 504 So.2d 556 (1987); Richoux v. Hebert, 449 So.2d 491 (La.App. 3d Cir.1983), writ denied, 450 So.2d 368 (1984).
In the present case, WPFA owed a duty to all rodeo spectators to keep the rodeo arena in a reasonably safe condition for those watching the rodeo and to provide seating that was safe for the spectators. We find this duty was breached by the use of the temporary box seating. A seat only *492 three feet from the arena fence, which measured less than six feet tall, was unsafe. In this location, a spectator was not protected from the risk of a rider being thrown over the arena fence. We further find that this unsafe seating configuration was a substantial cause in fact of Mrs. Creel's injuries.
In Creel v. Washington Parish Fair Ass'n, 517 So.2d 467 (La.App. 1st Cir.1987), we previously addressed the facts of this same case with respect to a different defendant, the rider that was thrown from the horse. This court stated as follows:
It is common knowledge to those familiar with rodeos that the essence of the sport of bronc riding is for the rider to remain on the bucking horse for as long as possible. However, even the best of riders are thrown from time to time. If a horse does throw a rider on a spectator, certainly that does create a harm to the spectator. However, under the law, it does not create an unreasonable risk of harm for which the rider can be held accountable in damages.
. . . . .
The record clearly indicates that in this instance, the rider did not owe a duty to the spectator. 517 So.2d at 468-69.
Although this court found that a rider who is performing at a rodeo is not accountable to a spectator for damages resulting from the rider being thrown from a horse, we do not reach the same conclusion with respect to WPFA's accountability. We find that the risk that a rider would be thrown from a horse and over the arena fence and the resulting harm, a spectator being injured, was within the scope of the protection afforded by the duty to provide safe seating to spectators. Additionally, we find the risk of a rider being thrown over the arena fence and causing harm to a spectator could have been greatly minimized by limiting seating to the permanent bleacher seats which were approximately eleven feet away from the arena fence. Thus, we find that WPFA breached its duty to provide safe seating to reasonably protect spectators from the foreseeable risk of a rider being thrown over the arena fence. For these reasons, we conclude that the trial court correctly imposed liability on WPFA for the injuries sustained by Creel as a result of the rodeo accident.
Appellants' next assignment of error is that the trial court abused its discretion by awarding clearly excessive damages. Appellants attack both the general damages award of $85,000.00 and the award of special damages in the amount of $12,024.30 as excessive.
First, we address the award of general damages, which we find is supported by the record. The medical testimony establishes that plaintiff has two ruptured cervical discs which cause her to suffer severe pain in her neck, arm and shoulder and that this condition will not improve without surgery. This pain greatly limits plaintiff's daily activities. The record further establishes that plaintiff has suffered from pain in her neck and shoulder since the time of the rodeo accident in 1983. The medical testimony strongly supports a finding that the rodeo accident was the cause of plaintiff's ruptured cervical discs. Based on these findings, we find that the general damages award of $85,000.00 is not an abuse of the trial court's great discretion. See, Mitchell v. Fire and Cas. Ins. Co., 540 So.2d 352 (La.App. 1st Cir.), writ denied, 541 So.2d 1390 (1989); Vaccaro v. Sports & Imports, Inc., 539 So.2d 989 (La. App. 4th Cir.), writs denied, 541 So.2d 1391, 1392 (1989); Sickinger v. New Orleans Public Service, 524 So.2d 93 (La.App. 4th Cir.1988).
Although the trial judge also referred to plaintiff's pre-existing lower back complaints, which he found may have been somewhat exacerbated by the accident, we cannot determine from the trial court's reasons whether the general damages award was based, in part, on plaintiff's back pain. After thoroughly examining the record, we do not find the evidence to be sufficient to support a finding that plaintiff's back problems were caused or aggravated by the rodeo accident. The preponderance of the medical testimony did not establish that the rodeo accident caused an aggravation of plaintiff's pre-existing back problems.
*493 Thus, an award of general damages, based on plaintiff's back pain would be manifestly erroneous. However, since we cannot determine whether the trial court actually awarded general damages based on plaintiff's back pain and since we find that the $85,000.00 award of general damages is supported by the evidence establishing that the rodeo accident caused plaintiff to suffer two ruptured cervical discs, we affirm the award.
Appellant also contends that most of the special damages awarded by the trial court are improper. After carefully reviewing each item of special damages awarded by the court, we find that only two of these special damage awards are manifestly erroneous. Clearly, all of the expenses which were related to the treatment of the ruptured cervical discs are proper based on the trial court's determination that the rodeo accident caused the ruptured cervical discs.
However, the trial court's award of the expense of $1992.00 for plaintiff's hospitalization in the Bogalusa Community Medical Center from November 30, 1984 through December 7, 1984, which a careful examination of the record reveals was for treatment of back pain, is not proper. As stated above, the record does not establish by a preponderance of the evidence that plaintiff's back pain was caused or aggravated by the rodeo accident. Thus, an award for expenses incurred in treating plaintiff's back pain is improper.
Also, we find the trial court's award of $370.00, which represented a charge by Dr. Roux and Associates for anesthesiology services provided during plaintiff's carpal tunnel procedure performed on December 10, 1987, was manifestly erroneous. The trial court concluded, based on the medical evidence, that plaintiff's carpal tunnel syndrome condition was unrelated to the rodeo accident and that its related expenses were not compensable. Clearly, the trial court erred in awarding this expense to plaintiff.
The total of these two expenses that were improperly awarded by the trial court is $2362.00. Thus, we reduce the award of special damages by this amount. The amended award of special damages is $9662.30.
For the above reasons, we find that the judgment in favor of Betty Creel and against WPFA and Alliance should be reduced from $97,024.30 to $94,662.30. In all other respects, the judgment is affirmed. All costs of this appeal are to be paid by WPFA and Alliance.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] Numerous other parties have been involved in this litigation but are not significant for purposes of this appeal.
[2] The actual measurements of the height of the fence were not taken until years after the accident in question and the parties conceded that some variations in the measurements may have occurred since the accident, due to changes in the condition of the dirt floor. However, the parties did not dispute that the measurements taken years later were approximately the same measurements that were in existence on the date of the accident.
[3] Mrs. Creel had previously undergone a cervical fusion at the C4-5 and C5-6 disc level, approximately twenty-five years prior to the time she was treated by Dr. Schuhmacher in December of 1985. According to plaintiff and her medical history, plaintiff's previous neck problems had been resolved for many years prior to the rodeo accident.
[4] The record clearly establishes that plaintiff suffered a work-related back injury several years prior to the rodeo accident. She was treated for lower back pain by her family physician several times each year from 1979 through April of 1983. Her lower back pain continued after the rodeo accident.
[5] A third party demand by WPFA and Alliance against the Professional Rodeo Cowboy Association was dismissed by the trial court in this judgment. However, WPFA did not assign error to this ruling of the trial court.

The trial court also considered a third party demand of WPFA and Alliance against Jackson for legal indemnification and rendered judgment awarding indemnification to WPFA and Alliance. Jackson has not appealed the trial court's judgment.
[6] The trial court concluded that the height of the fence was not faulty so as to render the WPFA liable. Applying a strict liability analysis, we find that the fence was not defective and thus agree with the trial court's decision.
[7] Jackson testified that he believed under their agreement that his idea for box seating had to be approved by the WPFA before he could employ this seating method and, therefore, he requested approval before doing so.